UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELIZABETH LILI SIMPSON and IDAHO MIGRATION ALLIANCE,<br><br>Plaintiffs,<br><br>FRIENDS OF LEE'S GULCH,<br><br>Plaintiff-Intervenor,<br>v.<br><br>DOUG BURGUM, Secretary of the United States Department of the Interior; JON RABY, Director of the Bureau of Land Management; JUNE SHOEMAKER, Acting Idaho State Director of the Bureau of Land Management; BIRK ROSEMAN, Twin Falls District Manager for the Twin Falls District; and LISA CRESSWELL, Shoshone Field Office Manager for the Shoshone Field Office, Twin Falls District, Idaho, Bureau of Land Management,<br><br>Defendants. | Case No. 1:24-cv-00536-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

In 2021, the Bureau of Land Management issued a decision approving a project to expand trail-based recreation within the Wood River Valley, a popular outdoor recreational area located in Blaine County, Idaho. The project – known as the Wood River Valley Recreation and Access project – authorizes the construction, use, and

maintenance of over 80 miles of new trails throughout the area. Many of the new trails would be open to motorized off-road vehicles, including all classes of motorized e-bikes, and many would run through critical big-game habitat, crossing migration corridors, stopovers, and seasonal ranges.

Plaintiffs Elizabeth Lili Simpson and Idaho Migration Alliance and Plaintiff-Intervenor Friends of Lee's Gulch each filed a separate complaint challenging the project. All three seek to set aside the decision to approve the project as arbitrary and capricious under the Administrative Procedure Act (APA). They raise claims under the Federal Land Policy and Management Act (FLPMA), the National Environmental Policy Act (NEPA), and BLM's off-road vehicle regulations. Simpson contends that BLM authorized the use of off-road vehicles in certain project areas contrary to the governing land use plan in violation of FLPMA and the off-road vehicle regulations; Idaho Migration Alliance raises claims under NEPA and FLPMA related to impacts on big-game habitat and the adequacy of BLM's environmental analysis; and Friends of Lee's Gulch challenges the authorization of motorized e-bike use in Lee's Gulch under NEPA, FLPMA, and BLM's off-road vehicle regulations.

Each plaintiff has moved for summary judgment. Defendants oppose all three motions and have filed their own consolidated cross-motion for summary judgment. The Court heard oral argument on July 27, 2026, and took the matter under advisement. For the reasons explained below, the Court will grant in part and deny in part each of the four motions.

## BACKGROUND

### A. The Wood River Valley Recreation and Access Project Area

The Wood River Valley runs south through central Idaho, following the Big Wood River as it winds through the micro-ranges of the Rocky Mountains from its headwaters below Galena Summit to the edge of the Snake River Plain. Attracted by the area's natural beauty, thousands of outdoor recreationists flood the valley every year, and their numbers keep growing. AR_001622. This growth has strained public lands. Over the past two decades, users have created routes across public and private land without permission, damaging natural resources and disturbing wintering deer and elk. AR_001637. Conflicts among users have increased as well. AR_014166. Blaine County first asked BLM to address these problems in 2005, and BLM proposed a travel plan for the area in 2007. AR_014166; AR_000009–65. Those efforts culminated in the Wood River Valley Recreation and Access project at issue here.

The project spans approximately 328,000 acres primarily located in Blaine County. BLM manages 140,733 of those acres, the state of Idaho manages 25,603, and the rest is private, city, and county land. AR_001624. Recreational activities in the project area are concentrated around the Croy Creek and Lake Creek Trailheads and include hunting, off-road vehicle use, mountain biking, horseback riding, hiking, fishing, dispersed camping, backcountry skiing, and snowshoeing. AR_001637. Essentially all of the project area is big-game habitat. AR_000412; AR_000669.

Lee's Gulch, near Bellevue, has long drawn horseback riders. BLM's 2007 proposed travel plan identified the "primary mode of transportation" in Lee's Gulch as

"Equestrian" and set an objective of managing the area "for equestrians to engage in trail and cross-country riding opportunities in solitude and close to nature." AR_000018; AR_000027. The Blaine County Commissioners agreed that the trails in Lee's Gulch should be open to all users but said they were "primarily to serve equestrians." AR_000005.

BLM land in the project area is governed by the Sun Valley Management Framework Plan, adopted in 1981. AR_012559–649. As BLM's regulations require, the Plan designated its lands as "open," "limited," or "closed" to off-road vehicles. AR_012646–49; AR_012664–65; see 43 C.F.R. § 8342.1. The regulations define an off-road vehicle as "any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain," subject to a short list of exclusions, including registered motorboats, fire, military, emergency, or law enforcement vehicles when used for emergency purposes, and vehicles whose use is expressly authorized. 43 C.F.R. § 8340.0-5(a). Off-road vehicles may travel anywhere at any time in an open area, are generally prohibited in a closed area, and are restricted to certain times, areas, or uses in a limited area. *Id.* § 8340.0-5(f)–(h); see id. § 8341.1(a)–(c). The restrictions in a limited area "may be of any type," including seasonal restrictions. *Id.* § 8340.0-5(g).

Within the project area, the Plan designated roughly 192,000 acres as open, 9,700 acres as closed, and 42,800 acres as limited. AR_012655; AR_012665. The closed areas include the North Ketchum Recreation Area and the Hemingway School Environmental Education Area, both "closed to all motor vehicle use." AR_012662–63; AR_012665.

For the limited areas, the Plan specified the restrictions that apply in each area. Most of the limited areas, including the Minnie Moore Area where Lee's Gulch lies, are "closed to all motor vehicle use December 1–April 30." AR_012647–48; AR_012657; AR_012665.

The Plan also established two Areas of Critical Environmental Concern. The 560-acre Sun Peak area preserves an existing vegetation community, and the 11,887-acre Elk Mountain area protects elk winter habitat. AR_012584; AR_012628. The Plan closed both to off-road vehicles, and those closures apply independently of whatever area designation overlays the land. *Id.*

In 2015, BLM amended the Plan through the Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management Plan Amendment (the Sage-Grouse Amendment). AR_012088–493; AR_012105. Within sage-grouse habitat management areas, the amendment redesignated all BLM-administered lands in Idaho as "Limited." AR_012116.

Sage-grouse habitat covers much of the project area, but not all of it. Roughly 241,000 of the project area's 327,780 acres lie within priority, important, or general sage-grouse habitat. AR_000654–55; AR_000668. The northern part of the project area does not. The parties dispute whether the Sage-Grouse Amendment nonetheless converted the Plan's open areas outside sage-grouse habitat into limited areas.

**B. Off-Road Vehicle Regulations and Motorized E-Bikes**

Electric bicycles, or e-bikes, entered the regulatory picture late in this project's life. Before 2020, BLM managed all e-bikes, including pedal-assist models, as off-road

vehicles. AR_013405. In August 2019, the Secretary of the Interior issued Secretarial Order 3376, which announced a policy that e-bikes should be allowed where other bicycles are allowed and directed BLM to propose a rule exempting e-bikes from the off-road vehicle definition. BLM published a proposed rule in April 2020 and a final rule that took effect on December 2, 2020. 85 Fed. Reg. 20229 (Apr. 10, 2020); 85 Fed. Reg. 69206 (Nov. 2, 2020). The rulemaking ran alongside this project. The proposed rule issued three months before the draft environmental assessment, and the final rule took effect nearly three months before BLM approved the project. The final rule added an exclusion from the off-road vehicle definition written specifically for e-bikes, 43 C.F.R. § 8340.0-5(a)(5), and left in place the older exclusion for "[a]ny vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved," *id.* § 8340.0-5(a)(3).

**C. Draft Environmental Assessment and Public Comments**

BLM began formal planning for the project in 2017. AR_001622. Big game surfaced immediately as a key planning issue for two reasons. First, user-created trails were already degrading big-game habitat, and second, essentially the entire project area is big-game habitat, and any new trail system would affect deer and elk. AR_001637; AR_000669. During scoping in September 2017, the Idaho Department of Fish and Game warned BLM that roads and trails displace elk from preferred habitat and reduce habitat effectiveness, with consequences for survival and reproduction, particularly in winter. AR_000094–102. It urged BLM to reduce redundant routes and to weigh public access against habitat protection. AR_000096–98.

In July 2020, BLM released for public comment a draft Environmental Assessment (EA) analyzing the project and its alternatives. AR_000739–841. The draft labeled each proposed trail "Motorized," "Motorized Class 1 e-bikes," "Motorized Class 1, 2, and 3 e-bikes," or "Non-Motorized (No e-bikes)." AR_000753. Every action alternative would have redesignated the Croy Creek trail network from non-motorized to "motorized but limited to Class 1, 2, and 3 e-bikes." AR_000762. The action alternatives also proposed new trails in Lee's Gulch open to all three classes of e-bikes. AR_000753. None proposed keeping horseback riding as the primary use in Lee's Gulch. And Alternatives B and D would have shortened the seasonal restriction on off-road vehicles by one month, from December 1–April 30 to January 1–April 30. AR_000755.

The draft EA stated that every alternative conformed to the Sun Valley Plan, as amended, but did not explain why. AR_000746. No alternative proposed amending the Plan's designations or its seasonal restrictions. The draft gave no reason for shortening the seasonal restriction, and it did not say that e-bikes would be exempt from even the shortened restriction anywhere in the project area. Its only discussion of conflicts between e-bikes and other users came in support of the Croy Creek change, where BLM reasoned that e-bike use on that network would be similar to use by traditional mountain bikes. AR_000762. The draft contained no discussion of potential conflicts between e-bike riders and horseback riders.

Public comment on the draft EA was extensive. BLM received 28 comments focused on Lee's Gulch. Intervenor's Ex. 1, Rows 1–28, Dkt. 54-2. Many of those commenters described the area's history as a riding destination and warned that

motorized users, including e-bike riders, would startle horses and put riders at risk. *Id.* As one commenter put it, "Motorized vehicles and horses don't mix." AR_001220. BLM received another 26 comments opposing motorized use, including e-bikes, across the project area more broadly, or asking BLM to allow only Class 1 e-bikes. Intervenor's Ex. 1, Rows 29–54. These commenters raised concerns about both user conflicts and wildlife. *Id.*

The Idaho Department of Fish and Game commented again in August 2020. It told BLM that all three action alternatives "would increase big game disturbance in all habitats," that added trails "would further fragment existing habitat, decrease habitat effectiveness, and particularly shrink security habitat for big game," and that the draft EA and its supporting documents supplied "no scientific bases" for validating BLM's assumptions or for a conclusion of only minor to moderate impacts. AR_001046–47. The Department singled out proposed trails connecting Slaughterhouse and Quigley Canyons, which it said "would considerably reduce big game security habitat in one of only three remaining large contiguous blocks of unfragmented big game habitat in the planning area." AR_001048. And it reminded BLM that Secretarial Order 3362 directs BLM to help state wildlife agencies conserve big-game winter range and migration habitat, both of which the planning area contains. AR_001049.

BLM's own wildlife specialist reached similar conclusions. He reported that the project would create "thoroughfares for human activity," that reducing "habitat use is a form of habitat loss," and that the action alternatives would produce "a net increase in human activity including during the winter season in occupied big game winter habitats."

AR_000651; AR_000653. He concluded that the project would have "long-term adverse impacts to wildlife resources" in all seasons and habitat types, with the greatest impacts to wintering big game. AR_000654. He also concluded, however, that with the project's design features and education measures in place, significant impacts to big game were not expected. *Id.*

**D. Challenged Decision**

In February 2021, following the comment period, BLM issued the final EA, a Finding of No Significant Impact (FONSI), and its Decision Record. AR_001616–721; AR_001733–41. BLM concluded that the project would not significantly affect the quality of the human environment and therefore did not prepare an Environmental Impact Statement. AR_001735.

BLM ultimately approved selected features from multiple action alternatives analyzed in the final EA. AR_001733. It authorized the construction, use, and maintenance of 80.7 miles of single-track trail and 0.7 miles of all-terrain vehicle trail, which together with campsite and trailhead roads brings the total to 82.6 miles. *Id.* Of the single-track, 41.7 miles are limited to Class 1 e-bikes, 15.6 miles are open to all three classes, and 2.0 miles are non-motorized. *Id.* BLM also converted the Croy Creek network from non-motorized to motorized use limited to Class 1, 2, and 3 e-bikes, authorized reroutes in four gulches including Lee's Gulch, and approved seven trailheads and campsite roads in five locations. AR_001733–34. The new trails in Lee's Gulch are open to all three classes of e-bikes. *Id.*

To limit the project's effects on wintering deer and elk, BLM imposed annual off-road vehicle restrictions from January 1 to April 30 on 95,629 acres and authorized "conditional temporary restrictions" on 29,468 acres that may prohibit all human use when conditions warrant. AR_013734. Compared with the Plan, BLM applied seasonal restrictions for off-road vehicles to more land but for less time – starting them in January rather than December. BLM also allowed all three classes of motorized e-bikes to use roads and trails within the seasonal restriction areas "unless conditional temporary restrictions are implemented to restrict their use." AR_013732.

On plan conformance, BLM stated only that the Decision "is in conformance with" the Sun Valley Plan and the Sage-Grouse Amendment. AR_013733. BLM quoted the Plan's direction that the unit "will be managed to protect the watershed resources, wildlife habitat, open space, and scenic values" while recreation "will be encouraged as long as the proposed uses do not significantly reduce the other values," and it listed the authorities with which the Decision "complies," including Secretarial Orders 3376 and 3362 and BLM's off-road vehicle regulations. *Id.* BLM did not explain how the January 1 start date squares with the Plan's December 1 start date.

Ten days before BLM issued the Decision, BLM staff met to discuss how the project's treatment of e-bikes complied with the amended off-road vehicle regulations. AR_012038. A memorandum of that meeting states that the EA addresses e-bike use under § 8340.0-5(a)(3) rather than § 8340.0-5(a)(5). *Id.* BLM did not mention either exclusion in the final EA or the Decision.

BLM addressed the shortened closure and user conflicts in its responses to public comments. Asked to retain the existing seasonal restriction between Townsend and Colorado Gulches, BLM answered that the area "will retain its seasonal motorized use restriction but the dates would change to January 1 - April 30th for the purposes of minimizing impacts to deer and elk." AR_013734. To a commenter who warned of "conflicts between motorized users and existing users, primarily horseback riders and hikers with dogs," BLM responded that "not all safety issues can be totally mitigated" but that they "will be addressed, to the extent practical, through trail design and outreach/education." AR_001227. BLM added that "[t]here is a long history of good relationships between all user types of the WRV." *Id.*

**E. Procedural History**

Simpson appealed the Decision to the Interior Board of Land Appeals (the Board) in March 2021, and the Board affirmed. *Elizabeth Lili Simpson*, 199 IBLA 32 (2024), AR_014165–98. While the appeal was pending, the Board granted Simpson's motion to withdraw her petition to stay the Decision, which it treated as a denial of the petition, and explained that the Decision had been effective since April 12, 2021. *Elizabeth Lili Simpson*, 197 IBLA 241, 245 (2021), AR_014032.

Simpson filed this lawsuit in November 2024. Dkt. 1. Friends of Lee's Gulch, an unincorporated association of local residents formed to preserve the traditional equestrian and pedestrian character of Lee's Gulch, intervened as a plaintiff. Dkt. 31. The Idaho Migration Alliance filed a separate action, which the Court consolidated with this one.

Dkt. 49. Neither organization existed when BLM issued the Decision, and neither appealed to the Board.

In September 2025, the Court denied Defendants' motion to dismiss Friends of Lee's Gulch, holding that an appeal to the Board was not a prerequisite to judicial review and that comments submitted by the association's now-members preserved its e-bike objections. Dkt. 43 at 4–12. All parties then filed the motions for summary judgment now before the Court. Dkts. 53, 54, 55, 56.

## STANDARD OF REVIEW

The Court's review of Plaintiffs' claims is governed by the Administrative Procedure Act (APA). Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence, or reached a decision so implausible that it cannot be ascribed to agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must "articulate a satisfactory explanation for its action," and the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*; *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Nor may the agency defend its action with "post hoc rationalizations" developed for litigation – judicial review is limited to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (cleaned up).

Review under this standard is narrow, and the Court may not substitute its judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). The Court must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise. *Id.* at 993. The agency's action is valid if it considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Id.* at 987.

## ANALYSIS

### A. Final Agency Action and Scope of Review

Before turning to the merits, the Court must identify the agency action under review. Defendants argue that the only final agency action under review is the Interior Board of Land Appeals' decision affirming the BLM, rather than BLM's Decision. From that premise, they reason that the Court cannot fault the agency on any ground not presented to the Board. On that view, the Court could not consider Friends of Lee's Gulch's challenge to BLM's reliance on 43 C.F.R. § 8340.0-5(a)(3) to authorize e-bike use or the Alliance's arguments about Trail 998A and the 2020 Ungulate Migration Report. The Court disagrees.

Under the Administrative Procedure Act, only "final agency action" is subject to judicial review. 5 U.S.C. § 704. A BLM decision becomes effective and final when the Board denies a petition to stay it. *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2010) (citing 43 C.F.R. § 4.21(a)(3) and *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1175, 1182 (9th Cir. 2000)); *see also Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 825, 828 (9th Cir. 2002). This was the

situation in *Desert Citizens Against Pollution v. Bisson*. There, the Board denied a petition for a stay. *Desert Citizens Against Pollution*, 231 F.3d at 1175. The Ninth Circuit therefore reviewed the BLM's decision as the final agency action. *Id.* at 1182.

The situation is the same here. The Board itself explained that when it granted Simpson's motion to withdraw her stay petition, "in effect denying the petition at her request," the Decision "became effective on April 12, 2021." AR_014031. The Board also recognized that "[a] decision which is made effective before or during an administrative appeal is subject to judicial review." *Id.* (citing *Darby v. Cisneros*, 509 U.S. 137, 154 (1993), and *In the Matter of Mandan Hidatsa and Arikara Nation*, 53 OHA 198, 203 (ruling that upon the expiration of 45 days or the denial of a stay petition a decision becomes not only effective but also subject to judicial review under the APA)). The Decision therefore became final agency action subject to judicial review. *See Desert Citizens Against Pollution*, 231 F.3d at 1175; *cf. Idaho Watersheds Project*, 307 F.3d at 828 (initial agency decision became final agency action when the agency arrived at a definite position and put the decision into effect); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 304 (D.C. Cir. 2013) (BLM's record of decision became final agency action when the Board did not act on a stay petition within 45 days).

This conclusion necessarily follows from the Court's earlier ruling that Friends of Lee's Gulch was not required to appeal to the Board before seeking judicial review. Dkt. 43 at 4–8. A party may bypass an administrative appeal and go to court only because the decision it challenges is already final. *Darby*, 509 U.S. at 152. Nor did the Board's later ruling on Simpson's appeal take that finality away from the parties who did not appeal.

*See, e.g., WildEarth Guardians*, 738 F.3d at 304 (BLM's initial decision became final agency action as to WildEarth when IBLA failed to act on WildEarth's stay petition, although separate party pursued its own appeal, and IBLA affirmed BLM decision in full); *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 864 F.3d 1105, 1111–12 (10th Cir. 2017) (petitioner's pending appeal to IBLA did not render initial decision non-final and thus not subject to judicial review when IBLA declined to stay enforcement of initial decision); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 255 F. Supp. 2d 1030, 1034 (D. Ariz. 2003) ("BLM decision became 'final' and subject to judicial review under § 704 once 45-day time limit for a stay expired," and IBLA subsequent grant of stay petition did not affect finality of decision).

At bottom, Defendants' argument is a repackaged version of their exhaustion argument, which the Court already rejected. Because the parties were not required to appeal to the Board, they were not required to raise particular issues there. Dkt. 43 at 11–12. Whether the Board's decision supersedes BLM's Decision as to Simpson, who did appeal, is a closer question. *See Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1145, 1150–51 (D. Or. 2010). But the Court need not answer it. On the issues Simpson presented to the Board, the Court considers the Board's reasoning below, and the result would be the same whichever decision the Court reviewed. And Friends of Lee's Gulch raises the e-bike challenge Simpson did not present to the Board.

The Court's review is confined to the administrative record that was before the agency when it acted. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). A party may challenge the agency's action only on grounds the agency had an opportunity to consider, which

generally means grounds raised during the public comment process with enough clarity to alert the agency to the party's position. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). Commenters need not use precise legal terms, and it does not matter whether someone other than the plaintiff raised the issue or the agency raised it on its own. *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007). Because the parties were not required to appeal to the Board, the question is whether BLM had notice of an issue, not whether anyone presented it to the Board. Dkt. 43 at 11–12. The Court addresses Defendants' specific waiver arguments with the claims to which they relate.

**B. Federal Land Policy and Management Act – Plan Conformance**

The Federal Land Policy and Management Act requires BLM to develop land use plans and to manage public lands "in accordance with" them. 43 U.S.C. §§ 1712, 1732(a). These land use plans are binding. See 43 U.S.C. § 1732(a) (BLM "shall manage the public lands . . . in accordance with the land use plans"). Once a plan is approved, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). These requirements "prevent BLM from taking actions inconsistent with the provisions of a land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004). If BLM wants to take an action the plan does not allow, it must first amend the plan, which brings with it public participation and environmental review. *See* 43 C.F.R. § 1610.5-5. "Unless and until the plan is amended, such actions can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *Norton*, 542 U.S. at 69.

BLM's off-road vehicle regulations fit within this framework. BLM designates lands as open, limited, or closed to off-road vehicles through the planning process, and "[t]he approval of a resource management plan, plan revision, or plan amendment constitutes formal designation" of those areas. 43 C.F.R. § 8342.2(b). BLM's own Travel and Transportation Management Handbook confirms that changing an area designation requires a plan amendment. AR_013276.

When the meaning of a land use plan is disputed, the Court applies the framework of *Kisor v. Wilkie*, 588 U.S. 558 (2019). *See Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 894 (9th Cir. 2025). Deference under *Kisor* is not automatic. The Court must first exhaust the traditional tools of construction, including text, structure, history, and purpose, and it may defer only if the plan remains genuinely ambiguous. *Kisor*, 588 U.S. at 573–75. If there is only one reasonable reading, that reading controls, and the agency's view does not enter the picture. *Id.* at 575. Even when a plan is genuinely ambiguous, the agency's reading must be reasonable and must reflect its authoritative, expertise-based, and fair and considered judgment. *Id.* at 575–79; *Cascadia Wildlands*, 153 F.4th at 898.

Simpson raises three conformance arguments. She contends that the Decision imposes restrictions on land the 1981 Sun Valley Management Framework Plan designated as open, loosens restrictions the Plan imposed on limited areas, and allows motorized use in areas the Plan closed. The Court takes each in turn.

### 1. Open Areas Outside Sage-Grouse Habitat

The Decision's seasonal restrictions extend onto land that the 1981 Sun Valley Management Framework Plan designated as open, including land in the northern part of the project area that lies outside sage-grouse habitat. Compare AR_001727, with AR_012655 and AR_000668. In an open area, off-road vehicles may travel "at all times, anywhere in the area." 43 C.F.R. § 8340.0-5(f). Restricting that travel for part of the year turns an open area into a limited one, and BLM may make that change only by amending the plan. Id. § 8342.2(b); AR_013276. Defendants concede that BLM did not amend the 1981 Plan's open-area designations before approving the project. They argue instead, as the Board held, that the 2015 Sage-Grouse Amendment had already redesignated every open area in the project area as limited, including land outside sage-grouse habitat. AR_014174–78; Dkt. 56-1 at 30–32.

The Sage-Grouse Amendment does not support that reading. BLM defined the amendment's reach in the amendment itself. It limited the "decision area" to "BLM-administered lands in GRSG habitat areas" and made clear that the amendment's decisions "apply only to BLM-administered lands, including split-estate lands, within GRSG habitat management areas." AR_012101 (emphasis added). For lands inside the broader "planning area" but outside the "decision area," BLM did not "establish any additional management"; those lands "will continue to be managed according to their existing, underlying land use plans." AR_012098. Within the decision area, by contrast, BLM redesignated the lands from "open" to "limited." AR_012116. Read together, these

provisions leave no real doubt. The amendment changed off-road vehicle designations inside sage-grouse habitat and left the 1981 Plan's designations alone everywhere else.

Defendants' contrary reading rests on a single sentence directing BLM to "[l]imit off-highway vehicle travel within Idaho BLM Field Offices to existing roads, primitive roads, and trails in areas where travel management planning has not been completed or is in progress." AR_012146. The Board read this sentence to redesignate as limited "all BLM-managed lands within the jurisdiction of the Shoshone Field Office." AR_014178. The sentence cannot bear that weight. It is plucked from one of the amendment's management decisions, and the amendment's decisions apply only within sage-grouse habitat areas. AR_012101. By definition, a management decision expressly limited to sage-grouse habitat areas cannot extend beyond those areas.

Defendants' reading also ignores the notice the regulations require. BLM designates areas for off-road vehicle use through the land use planning process, which includes public notice and participation. 43 C.F.R. § 8342.2. Nothing in the Sage-Grouse Amendment would have alerted a member of the public that land outside sage-grouse habitat, land for which BLM established no additional management, had been changed from open to limited. BLM's own interdisciplinary team appears to have understood the amendment's limited reach while preparing this project, noting that the amendment applied to "[p]ortions of the project area." AR_000107.

Defendants warn that a boundary drawn along sage-grouse habitat would be hard to manage, because the project area is heavily interspersed with private and other non-BLM land. AR_014178; Dkt. 56-1 at 31. The concern is a fair one, and Simpson's

counsel acknowledged at oral argument that such a boundary might be difficult to administer. But that is a reason to amend the Plan, not a reason to read the Plan as though it had already been amended. If a field-office-wide limited designation is the sensible way to manage this landscape, BLM has a process available to adopt one.

Because the amendment is not genuinely ambiguous on this point, there is no occasion to defer to BLM's reading. *Kisor*, 588 U.S. at 575. That also resolves Simpson's objection to the three exhibits BLM submitted to the Board with its supplemental answer, a 2015 Shoshone Field Office memorandum, a 2016 Instruction Memorandum, and a 2024 declaration. AR_014128–36. Simpson argues that those documents were outside the record and that the Board should not have considered them. The Court need not resolve that dispute. The exhibits show how BLM has interpreted and implemented the amendment since 2015. AR_014129; AR_014131. An agency's interpretation matters, however, only when the text leaves room for it, and this text does not. However consistently BLM has applied its reading, the exhibits cannot change what the amendment says.

The Sage-Grouse Amendment therefore changed the Plan's off-road vehicle designations only inside sage-grouse habitat management areas. To the extent the Decision imposes seasonal restrictions on land the Plan designated as open and that lies outside those habitat areas, the Decision does not conform to the Plan and violates the Federal Land Policy and Management Act and 43 C.F.R. § 8342.2(b).

The Court recognizes that this holding concerns restrictions that protect wildlife, not restrictions that loosen protection. Simpson explained at oral argument why the point

nonetheless matters to her. The areas the Plan closed or restricted from December through April sit at the entrances to the broader landscape, so they control access to it, and BLM's theory that the Sage-Grouse Amendment converted every open area to limited is the foundation of its defense of the changes it made to those areas. The defect lies in the process BLM used, not in the restrictions themselves. How that defect should be cured is a question for the remedy phase.

**2. Limited Areas and the December 1 Closure**

The Court now turns to Simpson's argument that the Decision wrongly modifies the seasonal closures the Plan set for its limited areas. As noted above, in addition to designating areas as open, limited, or closed, the Plan specified the restrictions that apply in its limited areas, and it closed most of them, including the Minnie Moore Area where Lee's Gulch lies, "to all motor vehicle use December 1–April 30." AR_012647–48; AR_012657; AR_012665. The Plan set out these restrictions in its off-road vehicle designation decisions and explained that they reflected "the minimum restrictions necessary to protect the resources" in areas with "crucial wildlife values." AR_012646–53. The Decision moves the start of the seasonal restriction to January 1. AR_013732. That opens December to off-road vehicle use in areas the Plan closed for that month. *See* AR_013734.

Defendants and the Board answer that the particular limits in a limited area are implementation-level decisions, which BLM may change without amending the Plan. AR_014170; AR_014180; AR_013390; AR_013395. As a general matter, that is correct. When a plan designates an area as limited and leaves the particular limits for later, BLM

may set and adjust them through an implementation-level decision. But the Plan here did not leave the limits for later. It chose them. Once BLM adopted the Plan, including its seasonal restrictions for limited areas, it could not take any action inconsistent with those provisions, even if it otherwise could have made this decision at the implementation level if the Plan had been silent. *Norton*, 542 U.S. at 69; *see also* 43 C.F.R. § 1610.5-3(a). Guidance in a BLM manual alone cannot relieve BLM of its obligation to conform its actions to its approved plan.

The Sage-Grouse Amendment bolsters this conclusion. Even inside sage-grouse habitat, where the amendment redesignated land as limited, it left in place "more restrictive" decisions in existing plans. AR_012112; AR_012114. The Plan's December 1 closure is such a decision. So the amendment did not disturb the closure inside sage-grouse habitat, and, as explained above, it did not touch the Plan at all outside that habitat.

Defendants point out that the Decision nearly triples the acreage subject to seasonal restrictions. AR_001256; AR_014184. The Court does not doubt it. But conformance is not measured by netting gains against losses. A plan that closes an area in December is not satisfied by closing a different area in January. Nor did BLM explain its choice. The only explanation BLM offered is a response to a comment stating that the new dates are "for the purposes of minimizing impacts to deer and elk." AR_013734. That statement explains why the area remains restricted, but not why BLM opened December in an area the Plan closed to protect wintering wildlife.

By shortening the Plan's December 1 closure without amending the Plan, BLM violated the Federal Land Policy and Management Act and 43 C.F.R. § 1610.5-3(a).

**3. Closed Areas and Areas of Critical Environmental Concern**

Simpson also argues that the Decision allows off-road vehicle use in areas the Plan closed, including the North Ketchum Recreation Area, the Hemingway School Environmental Education Area, and the Sun Peak and Elk Mountain Areas of Critical Environmental Concern. Dkt. 53-1 at 24, 27. Her argument rests on the Decision's seasonal restriction map, which shows seasonal restrictions overlapping parts of these areas. *See* AR_001727. A seasonal restriction implies that off-road vehicles may use the land for the rest of the year.

Defendants respond that the Decision does not authorize off-road vehicle use in any of these areas, which remain closed to all motorized use, including e-bikes. Dkt. 56-1 at 32–33; AR_012650; AR_012655; AR_012658; AR_012662–63. At oral argument, counsel reiterated that the Decision allows no off-road vehicle use of any kind in areas the Plan designated as closed and clarified that the seasonal restrictions apply only in limited areas. The Decision nowhere purports to open a closed area, and BLM did not amend the Plan's closures. The Court accepts Defendants' representation and holds BLM to it. The Decision does not authorize motorized use, including e-bike use, in any area the Plan closed to off-road vehicles, and the seasonal restriction map cannot be read to do so. With that understanding, Simpson has not shown that the Decision departs from the Plan's closures.

### C. Off-Road Vehicle Regulations – E-Bikes

Simpson and Friends of Lee's Gulch both challenge BLM's authorization of e-bikes on non-motorized trails, and in particular its decision to let all three classes of e-bikes use roads and trails within the off-road vehicle seasonal restriction areas. Defendants defend that authorization on a single ground. They argue that BLM excluded e-bikes from the definition of an off-road vehicle under 43 C.F.R. § 8340.0-5(a)(3), which excludes "[a]ny vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved." The Court concludes that BLM did not provide a reasoned basis in the Decision or the EA for authorizing e-bike use under § 8340.0-5(a)(3). In any event, BLM could not reasonably have authorized e-bike use under § 8340.0-5(a)(3), because the more specific provision governing e-bikes, 43 C.F.R. § 8340.0-5(a)(5), controls. BLM did not meet the requirements of that provision. The e-bikes the Decision authorizes therefore remain off-road vehicles, and BLM authorized their use without complying with the requirements that govern off-road vehicles.

#### 1. Waiver

The Court first addresses Defendants' contention that Friends of Lee's Gulch failed to exhaust its administrative remedies and waived its e-bike arguments by not raising them before BLM or the Board. Dkt. 56-1 at 38 n.12. Defendants acknowledge that the Court rejected these arguments in denying their motion to dismiss, and they do not reargue them. *Id.*; *see* Dkt. 43. The Court will not revisit that ruling. Friends of Lee's Gulch was not required to appeal to the Board before seeking judicial review, and comments from its now-members sufficiently alerted BLM to its concerns about e-bikes.

Dkt. 43 at 8, 12. Defendants raise the same exhaustion argument against Simpson. Dkt. 56-1 at 39 n.13. The Court need not resolve it, because Friends of Lee's Gulch also challenges the e-bike authorization, and the Court would reach that challenge regardless.

Defendants also argue that no commenter raised Friends of Lee's Gulch's narrower contention that BLM can authorize e-bike use on non-motorized trails only under 43 C.F.R. § 8340.0-5(a)(5), so that argument is waived. Dkt. 56-1 at 38 n.12. No commenter could have cited that provision, which took effect on December 2, 2020, after the comment period on the draft EA had closed. AR_000842. But commenters did tell BLM that e-bikes are not the same as traditional mountain bikes, *see, e.g.*, Dkt. 54-2, Rows 15, 24, 29–33, which goes to the very determination § 8340.0-5(a)(5) requires. And BLM considered the issue directly. Ten days before it issued the Decision, BLM staff met to discuss whether to authorize e-bikes under § 8340.0-5(a)(3) or § 8340.0-5(a)(5), and they chose § 8340.0-5(a)(3). AR_012038. Defendants concede that BLM "deliberately elected not to authorize e-bikes through (a)(5)." Dkt. 56-1 at 38. The argument is not waived.

**2. BLM's E-Bike Authorization**

As explained above, BLM had to articulate a satisfactory explanation for its action, and the Court may uphold the action only on the grounds BLM invoked when it acted. *State Farm*, 463 U.S. at 43; *Regents*, 591 U.S. at 20. BLM offered no explanation in the Decision or the final EA for allowing e-bikes to use roads and trails within the off-road vehicle seasonal restriction areas. The draft EA did not propose that use. BLM first added it as a note beneath a table in the final EA, AR_001633, and then repeated the note

in the Decision, AR_013732. Neither document explains why BLM allowed e-bikes on these trails during the seasonal restrictions that apply to other motorized vehicles. Neither document cites 43 C.F.R. § 8340.0-5 or states that BLM excluded e-bikes from the off-road vehicle definition. Both label every e-bike trail "motorized." AR_001630; AR_013731.

Defendants now contend that BLM authorized e-bike use under 43 C.F.R. § 8340.0-5(a)(3), so that "for purposes of the Decision, e-bikes are not off-road vehicles." Dkt. 56-1 at 37. The Decision is inconsistent with that position. It allows e-bikes to use roads and trails "within the OHV seasonal restriction areas." AR_013732. If BLM had excluded e-bikes from the off-road vehicle definition, the seasonal restrictions on off-road vehicles would never have applied to them, and BLM would have had no reason to make an exception for them. By making that exception, BLM treated e-bikes as off-road vehicles subject to the restrictions.

To show that BLM relied on § 8340.0-5(a)(3) when it acted, Defendants point to the memorandum of the February 16, 2021, staff meeting. Dkt. 63 at 11; AR_012038; *see also* AR_012036. A court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), and the Court has considered the memorandum for that purpose. But the memorandum does not provide the path through BLM's reasoned analysis. It records an internal staff discussion, not shared with the public, that BLM did not carry into the EA or the Decision. And the memorandum is internally inconsistent. In the same breath in which it invokes § 8340.0-5(a)(3), the memorandum states that e-bikes

"are classified as motorized vehicles however are being authorized in the EA and Decision Record by designating the trials [sic] as OHV Limited and the 'limits' are Limited to Class 1 e-bike use, or Class 1, 2, & 3." AR_012038. The second statement describes treating e-bikes as off-road vehicles and adjusting the limits that apply to them in limited areas, which is what the EA and the Decision did. An exclusion under § 8340.0-5(a)(3) would have removed e-bikes from the off-road vehicle definition altogether, leaving no limits to adjust.

Nor does the memorandum explain why BLM allowed e-bikes on these trails during the seasonal restrictions. The only reason it gives for choosing § 8340.0-5(a)(3) is that, under that approach, BLM could later modify the "limits" on the trails through a future NEPA document. AR_012038. As an example, staff pointed to allowing "the use of electronic uni-cycles, which currently would not be allowed on the trails." *Id.* That reason concerns BLM's future options. It does not address the effect of e-bike use on wintering wildlife, or on other trail users, in the areas BLM restricted.

The unicycle example also undercuts Defendants' position. Electronic unicycles are not e-bikes, *see* 43 C.F.R. § 8340.0-5(j) (defining an e-bike as a "two- or three-wheeled cycle"), and the memorandum acknowledges that adding them to the trails would require a future NEPA document regardless of which exclusion BLM used for e-bikes. AR_012038. Indeed, the memorandum states that even if BLM had relied on § 8340.0-5(a)(5) for e-bikes, it would add unicycles through the same method. *Id.* The choice between the two exclusions for e-bikes therefore had no bearing on unicycles. And the method the memorandum describes, adjusting the "limits" on trails designated as

"OHV Limited" to allow another type of motorized vehicle, is a way of authorizing off-road vehicle use in a limited area. It does not remove any vehicle from the off-road vehicle definition. The example confirms that BLM treated e-bikes as off-road vehicles and used § 8340.0-5(a)(3) as a label for adjusting the restrictions that apply to them.

The wildlife analysis adds to the confusion. The Wildlife Specialist Report states that "E-bikes are included in the non-motorized analysis." AR_000651. So one part of the record treated e-bikes as non-motorized, while the EA and the Decision labeled them motorized. BLM never reconciled the two.

The Court therefore cannot discern from the record a reasoned basis for BLM's decision to allow e-bikes within the seasonal restriction areas. Defendants' position that BLM excluded e-bikes from the off-road vehicle definition under § 8340.0-5(a)(3) appears nowhere in the Decision or the EA, and it conflicts with how both documents treat e-bikes. The memorandum, which summarized an internal staff discussion that was not part of the public process, cannot serve as the explanation that the Decision and the EA lack.

**3. 43 C.F.R. § 8340.0-5(a)(3)**

Even if BLM had provided a reasoned explanation for authorizing e-bikes under 43 C.F.R. § 8340.0-5(a)(3), it could not reasonably have authorized e-bike use under that provision. Defendants read the provision's plain language to mean that any vehicle whose use the authorized officer expressly authorizes is, for that reason alone, not an off-road vehicle. Dkt. 56-1 at 37–38. On that reading, BLM excluded e-bikes simply by authorizing them. The Court agrees with Friends of Lee's Gulch that Defendants' reading

of § 8340.0-5(a)(3) cannot be reconciled with the regulatory scheme or with BLM's reasons for adopting a rule governing e-bike exemptions, would render § 8340.0-5(a)(5) superfluous, and would lead to absurd results.

Defendants maintain that because the text of § 8340.0-5(a)(3) is unambiguous, the Court's inquiry should end there, without resort to other tools of construction. Dkt. 56-1 at 38, 40. The plain meaning of a regulation does govern. But the Court does not find plain meaning by reading one provision in isolation. It must interpret each provision in the context of the regulation as a whole. *See Kisor*, 588 U.S. at 575; *cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). And before the Court may defer to an agency's reading of its own regulation, it must exhaust all the traditional tools of construction, including the regulation's text, structure, history, and purpose. *Kisor*, 588 U.S. at 575. Only if the regulation remains genuinely ambiguous after that inquiry may the Court defer, and even then the agency's reading must fall within the zone of ambiguity the Court has identified. *Id.* at 575–76. If the regulation has only one reasonable reading, the Court need not accept an agency interpretation that is inconsistent with it. *Id.* at 575; *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012).

When BLM issued the Decision, the regulation contained a provision written specifically for e-bikes. BLM adopted 43 C.F.R. § 8340.0-5(a)(5) through notice and comment less than three months before it issued the Decision. That provision treats e-bikes as motorized vehicles within the off-road vehicle definition and excludes them from such treatment only when three conditions are met. The e-bike must be used on roads and trails where mechanized, non-motorized use is allowed. The motor must not be

exclusively propelling the e-bike for an extended period. And the authorized officer must have "expressly determined, as part of a land-use planning or implementation-level decision, that e-bikes should be treated the same as non-motorized bicycles." *Id.* § 8340.0-5(a)(5)(i)–(iii). If § 8340.0-5(a)(3) independently excluded from the off-road vehicle definition any e-bike whose use the officer authorized, those conditions would never matter. Under Defendants' reading, an officer could bypass all three simply by authorizing e-bike use.

The Court finds this reading, under which § 8340.0-5(a)(3) would permit without conditions what § 8340.0-5(a)(5) permits only with them, "hyperliteral and contrary to common sense." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). When a general authorization and a more limited, specific authorization exist side by side, "[t]he terms of the specific authorization must be complied with." *Id.* A specific provision controls a general one, and a regulation should not be read in a way that renders another provision superfluous. *Id.* That is particularly true where, as here, the agency adopted the specific provision to address a particular problem with a particular solution. *See id.*

Defendants respond that § 8340.0-5(a)(3) "could apply to any of the exemptions" and that overlapping regulatory authority is common. Dkt. 56-1 at 38 n.11, 40 n.14 (citing *Corrigan v. Bernhardt*, No. 1:18-cv-00512-BLW, 2020 WL 930490 (D. Idaho Feb. 26, 2020), *aff'd sub nom. Corrigan v. Haaland*, 12 F.4th 901 (9th Cir. 2021)). *Corrigan* does not support that proposition. The plaintiffs there argued that when BLM declined to renew their grazing permit for noncompliance, it could not treat their grazing

preference as lost without first cancelling it through the notice-and-protest procedures in 43 C.F.R. § 4170.1-1 and subpart 4160. *Id.* at *2. This Court rejected that argument because those procedures did not apply. The cancellation regulations "say nothing about the nonrenewal of permits due to noncompliance and hence do not govern this case." *Id.* at *3. The Court did not hold that BLM may choose between two regulations that both govern the same situation. Here, by contrast, § 8340.0-5(a)(5) applies to the very vehicles at issue. And under Defendants' reading, BLM could avoid each of its conditions whenever it chose, leaving that provision with no practical effect.

Defendants' reading also has no stopping point. At oral argument, counsel acknowledged that under Defendants' reading, BLM could authorize the use of a tank under § 8340.0-5(a)(3) and thereby declare it not to be an off-road vehicle. Counsel then suggested that tanks would likely fall under the separate exclusion for military vehicles. Counsel's second answer is correct, and the same reasoning applies to e-bikes. The regulation excludes combat and combat support vehicles only "when used in times of national defense emergencies." 43 C.F.R. § 8340.0-5(a)(6). If § 8340.0-5(a)(3) allowed BLM to exclude the same vehicles at any time simply by authorizing them, that condition would mean nothing, just as the three conditions in § 8340.0-5(a)(5) would mean nothing if BLM could exclude e-bikes the same way. When the regulation contains an exclusion written for a particular kind of vehicle, that exclusion governs. *RadLAX*, 566 U.S. at 645.

At oral argument, counsel also argued that other laws, such as NEPA, would still constrain any authorization under § 8340.0-5(a)(3). That may be so, but it does not resolve the problem. NEPA and similar statutes apply to BLM's authorization of vehicle

use whether or not the vehicle is excluded from the off-road vehicle definition. They do not supply the conditions BLM wrote into § 8340.0-5(a)(5), including the express determination that e-bikes should be treated the same as non-motorized bicycles. Under Defendants' reading, the regulation itself places no limit on the authorized officer's discretion under § 8340.0-5(a)(3).

Read in context, § 8340.0-5(a)(3) still applies to vehicles and uses that no specific exclusion addresses, such as equipment BLM approves for building a trail. *See* Dkt. 54-1 at 24. BLM may not use it, however, to avoid the conditions it placed on the exclusion written for e-bikes. Reading the regulation this way gives effect to each of its exclusions.

The preamble to the 2020 e-bike rule confirms the point. BLM explained that it had "ultimately decided that it would be more appropriate for authorized officers to analyze site-specific factors and determine where Class 1, 2, and 3 e-bike use is appropriate on an individual basis," recognizing that "user conflicts, and other relevant considerations" might make e-bike use inappropriate even where traditional bicycles are allowed. 85 Fed. Reg. at 69215 (AR_012057). BLM also committed to consider conflicts between e-bikes and other recreational uses, and impacts to wildlife, through the NEPA process "before any new e-bike use is authorized." *Id.* at 69209–10 (AR_012045; AR_012048). That site-specific process is precisely what § 8340.0-5(a)(5) contemplates. Defendants point to nothing in the rule or its preamble suggesting that an authorized officer could bypass it through § 8340.0-5(a)(3).

Defendants also point to the timing of the rulemaking. BLM began planning the project in 2017, and after the Secretarial Order issued, BLM guided field managers, for

the short term, to use the flexibility in the existing regulations to exclude certain classes of e-bikes from the off-road vehicle definition. Dkt. 56-1 at 37, 39; AR_012036. Defendants argue that the project team could not know when the final rule would issue and reasonably relied on the authority available during the administrative process. Dkt. 56-1 at 39. That history may explain why BLM looked to § 8340.0-5(a)(3) when it prepared the draft EA in July 2020. But the final rule took effect on December 2, 2020, and BLM did not issue the Decision until nearly three months later. BLM was bound by the regulations in effect when it acted. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1042 (9th Cir. 2023). And the staff memorandum shows that BLM knew of the new e-bike provision, considered it, and chose not to use it. AR_012038.

Applying these traditional tools of construction, the Court concludes that the regulation is not genuinely ambiguous. Read in the context of the regulation as a whole, § 8340.0-5(a)(3) does not allow BLM to exclude from the off-road vehicle definition any e-bikes that do not meet the conditions of § 8340.0-5(a)(5). BLM's contrary reading is inconsistent with the regulation, and the Court need not accept it. *Kisor*, 588 U.S. at 575; *Christopher*, 567 U.S. at 155. Even if the regulation were ambiguous, BLM's reading would not warrant controlling weight. The only contemporaneous statement of it is the memorandum of a staff meeting, which is not the kind of authoritative, official position *Kisor* requires. *Kisor*, 588 U.S. at 577. And as explained above, the memorandum itself describes e-bikes as motorized vehicles subject to adjusted limits, which is inconsistent with the reading Defendants now advance.

**4. 43 C.F.R. § 8340.0-5(a)(5)**

Because § 8340.0-5(a)(5) governs, BLM could exclude e-bikes from the off-road vehicle definition only by meeting its three conditions. Simpson and Friends of Lee's Gulch argue that BLM did not meet them. Defendants do not argue otherwise. They concede that BLM "deliberately elected not to authorize e-bikes through (a)(5)." Dkt. 56-1 at 38.

The record confirms that BLM did not satisfy those conditions. It contains no express determination that e-bikes should be treated the same as non-motorized bicycles, as § 8340.0-5(a)(5)(iii) requires. The Decision and the final EA instead label the e-bike trails "motorized." AR_001630; AR_013731. BLM also authorized all three classes of e-bikes without considering whether each class could be treated the same as a traditional bicycle on the trails at issue, even though the regulation distinguishes among the classes and commenters urged BLM to draw the same distinctions. 43 C.F.R. § 8340.0-5(j); AR_001166–68; AR_001294. The motor on a Class 2 e-bike, for example, may propel the bicycle without pedaling, 43 C.F.R. § 8340.0-5(j), which bears on the condition that the motor not exclusively propel the e-bike for an extended period, *id.* § 8340.0-5(a)(5)(ii). BLM's only discussion of whether e-bikes are compatible with traditional mountain biking concerned the Croy Creek network. AR_000762. BLM made no comparable finding for Lee's Gulch or the other trails where it authorized all three classes.

**5. E-Bikes Remain Off-Road Vehicles Under the Decision**

Because neither exclusion applies, the e-bikes the Decision authorizes are off-road vehicles. This finding has two consequences for the project.

First, in limited areas the Plan closed "to all motor vehicle use December 1–April 30," including the Minnie Moore Area where Lee's Gulch lies, allowing e-bikes to use trails during the closure conflicts with the Plan. AR_012647–48; AR_012657. Exempting one class of motor vehicle from the Plan's closure departs from the Plan as surely as shortening the closure does. For the reasons explained above, BLM could not make that change without amending the Plan. The Court therefore agrees with Friends of Lee's Gulch that allowing e-bikes on these trails during the closure does not conform to the Plan.

Second, because e-bikes remain off-road vehicles, BLM had to apply its designation criteria before opening trails to them. "All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Trails "shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands." *Id.* § 8342.1(c). BLM's own manual requires BLM to demonstrate compliance at the implementation level "by clearly linking the RMP goals and objectives to the appropriate elements of the designation criteria and describing measures taken to minimize damage, harassment, disruption and conflict with various resources." AR_013394. Defendants' only response is that modifying the restrictions in a

limited area is an implementation-level decision. Dkt. 56-1 at 40. But BLM must apply the designation criteria at the implementation level too, and the question is whether it did so here.

The record shows that BLM did not apply them in Lee's Gulch. As described above, Lee's Gulch has long been a destination for horseback riders, and many of the 28 comments on the draft EA that focused on Lee's Gulch warned that motorized users, including e-bike riders, would startle horses and endanger riders. AR_000018; AR_000027; Dkt. 54-2, Rows 1–28. BLM's responses addressed noise and distance from the homes at the mouth of the gulch, AR_001218, and offered the general assurance that "[t]here is a long history of good relationships between all user types of the WRV," AR_001227. Neither response engages the conflict the commenters raised, which was horses and motorized users sharing the same trails. And BLM's only discussion of e-bike compatibility, which concerned the Croy Creek network, does not address equestrians. AR_000762. Defendants do not contend that Croy Creek resembles Lee's Gulch.

Defendants argue that BLM balanced the preferences of equestrians against those of other users who wanted trails open to everyone, noting that the Blaine County Commissioners favored trails open to all users. AR_000005; AR_000079–80. BLM may well strike that balance. But it must strike it by applying the criteria its regulations require, and the record contains no indication that it did. A general policy against single-use trails, *see* AR_000079–80, does not substitute for that analysis.

BLM's authorization of Class 1, 2, and 3 e-bikes within the seasonal restriction areas, including in Lee's Gulch, was arbitrary, capricious, and not in accordance with law.

**D. National Environmental Policy Act**

The National Environmental Policy Act is a procedural statute. It requires an agency to take a "hard look" at the environmental consequences of a proposed action, but it does not dictate the result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). An agency may first prepare an environmental assessment to decide whether an action will significantly affect the environment. If it concludes the action will not, it may issue a finding of no significant impact instead of an environmental impact statement. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). An environmental impact statement is required if substantial questions are raised about whether the project may cause significant degradation of the environment. *Id.* The parties analyze that question under the context-and-intensity factors in the Council on Environmental Quality regulations that governed when BLM began this project, and the Court does the same. *See* 40 C.F.R. § 1508.27 (2019).

Judicial review of an agency's environmental analysis is deferential. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180–85 (2025). Whether an analysis is detailed enough "itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id.* at 181. That deference applies to environmental assessments as well as environmental impact statements. *Cascadia Wildlands*, 153 F.4th at 903. But deference presupposes reasoned analysis. The Court must still confirm that the agency addressed the environmental consequences of its action

and reasonably explained its decision. *Seven Cnty.*, 605 U.S. at 180. An agency that entirely fails to consider an important aspect of the problem does not receive deference on that aspect. *State Farm*, 463 U.S. at 43.

**1. User Conflicts in Lee's Gulch**

Friends of Lee's Gulch argues that BLM failed to take a hard look at conflicts between e-bike riders and horseback riders in Lee's Gulch. The Court agrees.

Defendants' principal response is that NEPA does not require an agency to consider effects on recreational experiences or the risk of accidents. Dkt. 56-1 at 40 (citing *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1466 (9th Cir. 1996)). The Court need not decide the full reach of that principle here, for two reasons. First, BLM itself identified user conflicts and safety as issues the project was meant to address, and it analyzed them in the EA. AR_001637; AR_001639–43. Defendants themselves describe user conflicts and safety as drivers of the Decision. Dkt. 63 at 12. Having defined user conflicts as an important aspect of the problem, BLM had to address them in a reasoned way. Second, in the rule that governs e-bike authorizations, BLM committed to "consider potential conflicts between e-bikes and other recreational uses on individual roads and trails through future National Environmental Policy Act (NEPA) processes before any new e-bike use is authorized." 85 Fed. Reg. at 69209 (AR_012045). The trails in Lee's Gulch are individual trails on which e-bike use is a new use. BLM's NEPA review of this project was the process that commitment described.

BLM did not carry out that commitment in Lee's Gulch. Its discussion of user conflicts is general. It explains that more trails will spread users out and reduce conflicts

overall, AR_001639–43, and that conflicts will be addressed through trail design, outreach, and education, AR_013734. Those points may be true across the project area. They say nothing about whether e-bikes and horses can safely share the new trails in Lee's Gulch, which was the specific concern commenters raised again and again. Dkt. 54-2, Rows 1–28. BLM's responses to those comments, as explained above, addressed noise and distance from homes, or offered the general assurance of good relations among users. AR_001218; AR_001227. An agency that identifies an issue as important and then does not address the specific concerns raised about it has failed to consider an important aspect of the problem. *See State Farm*, 463 U.S. at 43. BLM's treatment of user conflicts in Lee's Gulch falls short of the hard look NEPA requires.

Friends of Lee's Gulch also argues that BLM failed to consider the effects of e-bikes on wildlife in Lee's Gulch. Here the Court is not persuaded. BLM analyzed wildlife impacts across the project area, and Friends of Lee's Gulch has not identified anything about Lee's Gulch that would make those impacts different there. Dkt. 56-1 at 38–39. As noted above, however, the Wildlife Specialist Report analyzed e-bikes as a non-motorized use, AR_000651, while the Decision treats them as motorized. If BLM revisits the e-bike authorization, it should reconcile its wildlife analysis with whatever classification it adopts.

**2. Impacts to Big Game**

The Idaho Migration Alliance's NEPA claims focus on big game. The Alliance argues that BLM failed to take a hard look at impacts to big game, failed to use the best available science, failed to analyze cumulative impacts, relied on incorrect assumptions

about Trail 998A, and should have prepared an environmental impact statement. Some of these arguments ask the Court to weigh the evidence differently, which is not the Court's role. But one thread runs through several of them and warrants closer consideration. BLM recognized that the project would cause long-term harm to big game and concluded that the harm would not be significant because of the project's design features, seasonal restrictions, and education efforts. It never explained how those measures would bring the harm below the level of significance.

**a. Mitigation and the Finding of No Significant Impact**

The Alliance's central argument is that BLM's conclusion of no significant impact cannot be reconciled with the findings of its own wildlife specialist and the comments of the Idaho Department of Fish and Game. BLM did not hide the harm. As described above, its wildlife specialist concluded that the project would have long-term adverse impacts to wildlife in all seasons and habitat types, with the greatest impacts to wintering big game. AR_000651; AR_000654. The Department went further. It told BLM that every action alternative would increase big-game disturbance in all habitats and shrink security habitat, and that the draft EA supplied no scientific basis for BLM's assumptions or for its conclusion that the impacts would be only minor to moderate. AR_001046–47.

Against those findings, BLM's conclusion rests principally on mitigation. The specialist concluded that significant impacts to big game were not expected because of the project's design features and education measures. AR_000654. The EA reached the same conclusion for the same reasons. AR_001654.

An agency may rely on mitigation measures to support a finding of no significant impact. But mitigation must be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352. "A perfunctory description, or mere listing of mitigation measures, without supporting analytical data," will not suffice. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) (cleaned up). NEPA does not require BLM to quantify the effect of each measure, to adopt a complete mitigation plan, or to accept the Department's recommendations. *Robertson*, 490 U.S. at 352–53. But when an agency relies on mitigation to conclude that impacts it has acknowledged will not be significant, it must explain why. And when the expert state agency specifically challenges the basis for that conclusion, the agency's response must engage the challenge rather than restate the conclusion. *See State Farm*, 463 U.S. at 43; *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

BLM did not provide that explanation. BLM acknowledged that the project would increase disturbance in all big-game habitats, fragment previously unaltered habitat, and produce a net increase in conflicts with big game, and that shortening the closure would increase impacts on wintering animals early in the season. AR_001650–51; AR_001653. It concluded that those impacts would be only minor to moderate based in part on the small increase in route density, AR_001653, but principally on assumptions that a designated trail network would draw recreationists off user-created routes and that outreach and signage would achieve "some success." AR_001635; AR_001654. The Department told BLM that the first assumption was "key for assessing the significance of

big game impacts" and that the EA offered no scientific basis for it or for the minor-to-moderate conclusion. AR_001047. It also told BLM that the design features gave "little practical information about how BLM would administer, monitor, enforce, and adapt" them, and that the conditional restrictions set no thresholds for when they would apply. AR_001048–50.

BLM responded to the Department's comments point by point, AR_001326–28, but its responses do not answer the Department's central criticisms. To the Department's criticism that the EA offered no scientific basis for its conclusion, BLM answered that its minor-to-moderate conclusion "is based on success of implementing the design features and management plan." AR_001326. That restates the conclusion without explaining why BLM expected the measures to succeed. BLM also pointed to its recreation use estimates and invited the Department to provide any empirical information or scientific literature it wanted BLM to use. *Id.* But the use estimates show how many people BLM expects on the trails, not whether a designated trail network will reduce the use of user-created routes. And the obligation to support the agency's conclusion rests with the agency, not with those who comment on it. *See Balt. Gas & Elec.*, 462 U.S. at 97.

On thresholds, BLM referred the Department to its issue worksheet. AR_001326. That worksheet identifies BLM's significance threshold – whether the project impacts deer and elk herd viability within the game management unit – and lists factors bearing on disturbance, such as snow conditions and animal condition. AR_000128. It does not say what monitoring results would trigger a conditional restriction or other adaptive measure. And on staffing and resources, BLM acknowledged that even with agreements

among partners, "there are no absolute guarantees with changing budgets and administrations" that any measure will be carried out every year. AR_001326. That candor is appropriate, but it heightens the need to explain why the measures on which the finding rests would be enough.

The final design features and management plan adds some detail. It provides that BLM will consult with the Department before imposing conditional restrictions, and it limits their duration and extent. AR_001609. But it still sets no thresholds for when those restrictions would apply, AR_001610, and it makes its adaptive management measures contingent on monitoring that reveals "thresholds identified and analyzed in the EA," AR_001614. As just explained, the record identifies no such thresholds for big game.

The seasonal restrictions are the most concrete of BLM's measures, and they are no doubt substantial. The Decision nearly triples the acreage subject to annual seasonal restrictions and allows BLM to close additional areas to all human use when conditions warrant. AR_013732; AR_014184. BLM also adopted several of the Department's recommendations, including the seasonal closures the Department had described as a potentially "reasonable balance of big game protections and recreation," and it dropped a proposed trail on Patterson Peak and proposed no routes in the Smoky-Boise priority area. AR_001049–50; AR_001609; AR_001634.

The Court does not discount those choices. But the seasonal and conditional restrictions address the winter months. For migration and parturition habitat, where BLM's specialist found adverse impacts and no seasonal restrictions apply, BLM relied on education and outreach, which the EA acknowledges may leave residual effects.

AR_000654; AR_001651; AR_001653. The management plan contemplates seasonal restrictions during calving and fawning as a possible adaptive measure, AR_001614, but only if monitoring reveals thresholds that neither the management plan nor the EA identifies. And BLM did not explain how the restrictions, together with the other measures, bring the project's overall impact on big game below the level of significance.

The Court is mindful that it must be at its most deferential when an agency makes predictive judgments about the significance of environmental effects. *Seven Cnty.*, 605 U.S. at 182–83. The Court is not second-guessing BLM's prediction about how well its measures will work. The difficulty is that BLM did not explain the basis for that prediction when the Department specifically challenged it, and without that explanation there is nothing to which the Court can defer. On this record, BLM's finding of no significant impact to big game is not adequately explained.

**b. Best Available Science**

The Alliance argues that BLM failed to use the best available science. It points to the 2020 Ungulate Migration Report, which maps two mule deer migration routes that pass through the project area along Trail Creek Road, including Lake Creek and Taylor Canyons, and to more recent mapping data from the Idaho Fish and Wildlife Information System. Dkt. 55-1 at 49–52. According to the Alliance, the Wildlife Specialist Report's maps of winter range and migration corridors do not include those routes. *See* AR_000669. Defendants respond that the Alliance waived this argument by not raising it during the comment period and that the report is outside the administrative record. Dkt. 56-1 at 21–24. They ask the Court to strike the Alliance's addendum. *Id.*

The Court's review is generally limited to the administrative record. *Camp*, 411 U.S. at 142. The Ninth Circuit allows narrow exceptions, including when extra-record material is necessary to determine whether the agency considered all relevant factors and explained its decision. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). The Court will consider the 2020 report for that limited purpose. The Alliance is correct that it could not have raised the report during the comment period, because the report was not published until November 2020, after the comment period closed. AR_000842–43; Dkt. 59. The Court will not, however, consider the maps and figures prepared by the Alliance's consultant, which are not part of the report and which Defendants have had no opportunity to test. Dkt. 55-1 at 53–61. Nor will the Court consider the 2025 Ungulate Migration Report, which postdates the Decision by four years. Information that did not exist when the agency acted cannot show that the agency acted unreasonably. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). And to the extent the Alliance contends that the 2025 report requires supplemental analysis, it did not plead that claim. The Court therefore considers the 2020 report for that limited purpose and otherwise confines its review to the administrative record.

Even considering the 2020 report, the Court cannot conclude that BLM failed to consider migration. BLM analyzed mule deer migration corridors using updated delineations provided by the Idaho Department of Fish and Game, the agency with primary responsibility for managing big game in Idaho. AR_001649. The excerpts of the 2020 report on which the Alliance relies were themselves prepared by the Department. Dkt. 55-1 at 52. BLM could reasonably rely on the migration data the Department gave it

directly. An agency's choice among data sources is the kind of technical judgment to which courts owe particular deference. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). Because the Court reaches this conclusion on the merits, it need not decide Defendants' waiver argument.

**c. Cumulative Impacts**

The Alliance's challenge to BLM's cumulative impacts analysis fails in part and succeeds in part. BLM drew the analysis area to include seven game management units covering roughly 17,500 square kilometers, explaining that the area was chosen "to capture the extent of most seasonable movements of animals that migrate through or utilize seasonal habitats in the planning area." AR_001654. That is a reasoned choice, and agencies have broad latitude to draw such lines. *Seven Cnty.*, 605 U.S. at 182. But within that area, BLM acknowledged that the project would "disturb and fragment big game habitats amongst all seasonal use periods," that it would affect winter and migration habitat the most, that impacts would increase over time with population growth, and that each action alternative cumulatively increases impacts to big game. AR_001654. It then concluded that the cumulative effects would be no more than minor, relying again on the design features and education efforts. *Id.* For the reasons just explained, that conclusion lacks the explanation NEPA requires. The Alliance also faults BLM's conclusion that the project would have a moderate beneficial cumulative effect on public access, AR_001648, arguing that access is not an environmental effect. Whatever the merit of that point, it does not bear on BLM's analysis of big game.

**d. Trail 998A**

The Alliance argues that BLM relied on incorrect assumptions about Trail 998A, which runs into Lake Creek Canyon, where members of the Alliance live. Dkt. 55-2 ¶ 4. According to the Alliance, the trail connects to no authorized trail at either end. Its southern end meets a user-created footpath that crosses the Sun Peak Area of Critical Environmental Concern and both mule deer migration routes, and its northern end was to meet a Forest Service trail that the Forest Service never approved. Defendants respond that the Alliance waived this argument and that it fails on the merits. Dkt. 56-1 at 40–42.

The Court agrees that it fails on the merits and does not reach waiver. BLM's analysis addressed the possibility that trails would need to connect across non-BLM land, AR_001640, and the project's design features provide that "[n]o trails, trailheads nor campsite roads [will] be constructed until legal access is obtained and documented," AR_001603; *see* AR_013732. BLM analyzed the use of Trail 998A in its wildlife analysis. AR_001728; AR_000669. The Alliance has not explained how the status of the trail's connections would change that analysis. And to the extent the Alliance is concerned about the footpath, the Decision does not authorize it, and, as explained above, BLM remains bound by the Plan's closure of the Sun Peak area.

**e. Environmental Impact Statement**

Finally, the Alliance argues that BLM should have prepared an environmental impact statement because the project's effects on big game are highly controversial and highly uncertain. 40 C.F.R. § 1508.27(b)(4)–(5) (2019). The Court need not decide that question now. Whether an environmental impact statement is required depends on

whether the project's effects are significant, and BLM has not yet adequately explained its conclusion that they are not. *See, e.g., WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 739 (9th Cir. 2025) (citing *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008) (district court may remand to agency to reconsider whether to prepare a revised EA or consider whether an EIS is required when there is uncertainty over whether a proposed project has a significant impact)). What further analysis BLM must undertake is a question for the remedy phase. *Id.* But if BLM cannot explain how its measures reduce the impacts to big game below the level of significance, it will have to prepare an environmental impact statement.

**E. Federal Land Policy and Management Act – Protection of Big-Game Habitat**

The Alliance also argues that the Decision violates FLPMA because it does not protect big-game habitat as the Plan requires. The Plan directs that the Big Wood unit "will be managed to protect the watershed resources, wildlife habitat, open space, and scenic values," while recreation and other uses "will be encouraged as long as the proposed uses do not significantly reduce the other values." AR_012596.

That direction calls for balance, not for the exclusion of recreation. It permits recreation so long as recreation does not significantly reduce the values the Plan protects, including wildlife habitat. Whether the project meets that standard turns on the same question as the Alliance's NEPA claim, which is whether the project will significantly affect big game and its habitat. Because BLM has not adequately explained its answer to

that question, the Court does not resolve this claim independently. If BLM revisits its analysis of impacts to big game, it should address the Plan's direction as well.

**F. Remedy**

The parties agreed to bifurcate briefing on liability and remedy, and the pending motions address liability only. The Court has found four defects in the Decision. BLM imposed seasonal restrictions on land the Plan designated as open outside sage-grouse habitat without amending the Plan. It shortened the Plan's December 1 closure in limited areas without amending the Plan. It authorized all three classes of e-bikes within the seasonal restriction areas, including in Lee's Gulch, without explaining that decision, without meeting the requirements for excluding them from the off-road vehicle definition, without applying the designation criteria, and without taking a hard look at conflicts between e-bikes and horseback riders in Lee's Gulch. And it failed to explain how the project's design features, seasonal restrictions, and education efforts would reduce the project's impacts on big game below the level of significance, both directly and cumulatively.

The Court does not reach whether BLM must prepare an environmental impact statement or whether the project conforms to the Plan's direction to protect wildlife habitat. Both questions turn on BLM's analysis of impacts to big game, which the Court has found inadequately explained. The Court rejects Plaintiffs' remaining claims. The parties should address in their remedy briefing whether these defects warrant vacatur of all or part of the Decision or remand without vacatur, and how any remedy should account for the portions of the Decision that remain in place.

## ORDER

**IT IS ORDERED that:**

1. Plaintiff Elizabeth Lili Simpson's Motion for Judicial Review aka Motion for Summary Judgment (Dkt. 53) is **GRANTED in part and DENIED in part**.

2. Plaintiff-Intervenor Friends of Lee's Gulch's Motion for Judicial Review (Dkt. 54) is **GRANTED in part and DENIED in part.**

3. Plaintiff Idaho Migration Alliance's Motion for Judicial Review and Summary Judgment (Dkt. 55) is **GRANTED in part and DENIED in part**.

4. Defendants' Cross-Motion for Summary Judgment (Dkt. 56) is **GRANTED in part and DENIED in part.**

DATED: September 30, 2026

B. Lynn Winmill
U.S. District Court Judge